**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| NEIL F. LURIA, IN HIS CAPACITY AS LIQUIDATING TRUSTEE OF THE SHARITY MINISTRIES, INC. LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>BAKER & HOSTETLER LLP, an Ohio Limited Liability Partnership; and MARK S. LANGE, ESQ.<br><br>Defendants. | Case No. _____<br><br><br>**COMPLAINT FOR DAMAGES**<br><br>**Jury Trial Requested** |

## I.    INTRODUCTION

1.    This is an action for professional malpractice, breach of fiduciary duty, avoidance and recovery of fraudulent transfers seeking damages from Defendants Baker & Hostetler LLP ("Baker") and Mark S. Lange, Esq. ("Lange") arising from their representation of Sharity Ministries, Inc. (formerly Trinity Healthshare, Inc.)[1]—a now-bankrupt purported nonprofit whose successor is Plaintiff Sharity Ministries, Inc. Liquidating Trust (the "Trust"). These claims arise from Defendants' conduct in advising and representing Trinity while Trinity was used as the public-facing "ministry" for a nationwide scheme that marketed and sold unlawful insurance-like products to consumers, providing minimal and illusory coverage, while leaving substantial unpaid member claims and creating massive liabilities for members and the estate. In short, as set forth in

---

[1] For clarity, this Complaint refers to the entity as "Trinity" during the relevant period, and as "Sharity" after the name change and when describing the bankruptcy and post-petition events.

further detail below, Defendants made a Faustian bargain: they received over $5 million in fees to play an essential role in propping up and expanding a business that stole hundreds of millions from unsuspecting members.

2.      At all relevant times, Trinity operated with liabilities that far exceeded its available resources and without reserves sufficient to satisfy reasonably anticipated member claims. Despite those circumstances, Defendants advised and assisted Trinity in maintaining and promoting a structure that exposed Trinity to escalating obligations while facilitating the transfer of substantial funds to insiders and affiliated entities for little or no reasonably equivalent value. Defendants' conduct foreseeably deepened Trinity's insolvency, increased unpaid member obligations, and diminished the value of the estate ultimately entrusted to the Liquidating Trustee.

3.      As described in detail in prior proceedings in this District, Sharity's name and purported "ministry" status were used to fraudulently sell thousands of consumers plans that were represented as "not being insurance," while marketed and administered as health coverage and obligating members to make premium-like monthly payments. *See, e.g., LeCann, et al. v. Aliera Cos.,* No. 1:20-cv-2429-AT, 2021 U.S. Dist. LEXIS 115827 (N.D. Ga., June 22, 2021). Those payments were collected and controlled by Aliera and its insiders, who diverted millions to themselves rather than maintaining reserves and paying members' medical claims. Predictably, claims went unpaid; regulatory scrutiny intensified; and Sharity ultimately collapsed into bankruptcy, leaving massive unpaid obligations to members. Claims exceeding $362,764,161 made by members of Sharity for unpaid medical bills and premiums for fake insurance have been approved by the Bankruptcy Court. But for Baker and Lange's acts and omissions, Sharity would not have been saddled with this massive exposure.

4.     Baker and Lange received over $5 million in fees to represent Sharity during the period the scheme was operating. As sophisticated and experienced counsel, they were uniquely positioned to protect Sharity—an unsophisticated entity with no meaningful internal infrastructure—from becoming further enmeshed in unlawful conduct and escalating liability. Instead, Defendants breached their duties of competence, diligence, loyalty, and candor by, among other things: (i) cementing Sharity's dependence on Aliera, an entity committed to looting not serving Sharity, with interests adverse to and incompatible with Sharity's viability; (ii) contractually obligating Sharity to continue to divert such disproportionate revenue to Aliera as to render Sharity incapable of satisfying members' medical claims; (iii) "papering over" fatal legal and operational deficiencies that made Sharity's operations untenable; and (iv) knowingly making, adopting, or advancing material misstatements and omissions to courts, regulators and other stakeholders, thereby prolonging the scheme's lifespan and magnifying the losses ultimately borne by Sharity's members and the bankruptcy estate.

5.     The damages flowing from this misconduct are concrete and substantial. Defendants' conduct enabled Sharity to continue collecting premium-like payments, operate while insolvent and under regulatory fire, and accumulate unpaid member medical claims and related liabilities—exposures that would have been mitigated or avoided had Defendants fulfilled their professional obligations by advising Sharity to cease unlawful conduct, unwind unlawful relationships, and take steps to limit further harm to its members. Defendants knew that Aliera, which controlled both Sharity's capital and communications with Sharity's members, had no intention of paying members' claims for medical benefits: early in the relationship, Baker's own analysis concluded that, at most, only approximately 16.03% of member payments was available to pay claims—far less than the 80% medical loss ratio required of regulated insurance plans.

6.    Plaintiff brings this action to recover damages suffered by the Trust and, where applicable, to avoid and recover transfers made to Defendants while Sharity was insolvent and receiving less than reasonably equivalent value.

## II.    PARTIES

7.    Plaintiff Neil F. Luria (the "Liquidating Trustee" or "Trustee") is the duly appointed liquidating trustee of the Sharity Ministries, Inc. Liquidating Trust (the "Trust") under the Plan of Liquidation (the "Plan") approved by the bankruptcy court in *In re Sharity Ministries, Inc.*, No. 21-11001-TMH (Bankr. D. Del.). As the Trustee, Mr. Luria has standing and authority to prosecute causes of action on behalf of the Sharity estate and, as applicable, on behalf of creditors—members who were damaged by the scheme—pursuant to 11 U.S.C. § 544 and other applicable authority.

8.    Sharity Ministries, Inc. was formerly known as Trinity Healthshare, Inc. until mid-2020 when it operated under the name Sharity Ministries, Inc. Trinity/Sharity was a Delaware nonprofit corporation that maintained its principal place of business in Fulton County, Georgia. The Trustee is a citizen of Florida.

9.    Defendant Baker is a law firm organized as an Ohio limited liability partnership, with offices nationwide, including in Atlanta, Georgia. Upon information and belief, Baker, through its attorneys and agents, committed the acts and omissions alleged in this Complaint substantially, although not exclusively, from and through its Atlanta office.

10.    Defendant Lange is a partner in Baker's Atlanta office. The acts and omissions alleged herein as to Baker were undertaken by Lange and/or by other Baker attorneys acting under Lange's direction, supervision, or control and within the course and scope of his and their agency and employment.

### III.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1334. The claims asserted in this Complaint arise in, arise under, and/or relate to the Bankruptcy Case and the administration of the Sharity estate and Trust.

12.    This Court has personal jurisdiction over Defendants because, among other things, Defendants purposefully directed their conduct toward Georgia and this District, performed substantial work in this District, and the acts and omissions giving rise to Plaintiff's claims occurred substantially in this District.

13.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1409(c) because a substantial part of the events and omissions giving rise to the claims occurred in this District and because the claims are related to the Bankruptcy Case which Sharity commenced in this District.

14.    The statute of limitations for Plaintiff's claims against Baker and Lange was tolled as of June 6, 2023 pursuant to a series of Tolling Agreements executed by the parties. The present Complaint was filed prior to the expiration of the Tolling Agreement.

15.    Plaintiff reserves his rights to a jury trial with respect to all matters so triable.

### IV.    FACTS

#### A.    Background on Health Care Sharing Ministries

16.    When Congress passed the Patient Protection and Affordable Care Act ("ACA") in 2010, it required most Americans to purchase minimum essential insurance coverage or pay a tax penalty. 26 U.S.C. § 5000(a)-(b). That individual mandate contained certain limited exceptions. One was for members of a qualifying tax-exempt "health care sharing ministry," or "HCSM," defined as an organization:

- described in Internal Revenue Code section 501(c)(3) and exempt from taxation under section 501(a);

- the members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed;

- the members of which retain membership even after they develop a medical condition;

- which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999; and

- which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

26 U.S.C. § 5000A(d)(2)(B)(ii)(I-V).

17.     The HCSM exemption is a narrow safe harbor for bona fide, longstanding charitable or religious ministries—not a loophole for commercial actors to sell insurance-like products while evading insurance regulation and ACA consumer protections. The HCSM exception's § 501(c)(3) requirement cabins the exemption to genuine nonprofit ministries subject to baseline federal governance and reporting. The exception's "common set of ethical or religious beliefs" requirement demands specific, operationalized tenets that actually govern eligibility and sharing (not a vague "belief in God"), reflecting the historical reality that true sharing ministries arise from cohesive faith communities with concrete standards. The exception's continued-membership-after-sickness requirement prevents post-claim underwriting and protects against "shareability" rules that function like rescission. The exception's pre-1999 continuous-existence requirement limits the exemption to organizations with a demonstrated track record and blocks opportunistic entrants created to circumvent the ACA. The exception's independent GAAP audit requirement ensures transparency about financial condition—critical in any risk-spreading

arrangement—so members and regulators can assess whether the ministry is solvent enough to do what it promises: timely pay (i.e., "share") members' medical expenses.

18. Insurance is a heavily regulated industry. State departments of insurance regulate licensed insurance companies' benefit offerings, pricing, and capital and reserve requirements to ensure insurers maintain sufficient financial resources to pay claims as they come due. Federal law also regulates entities that spread health care risk, imposing consumer-protection and market-stabilization requirements. Under the ACA's medical loss ratio rules, for example, health insurers generally must spend at least 80% of premium revenue on medical care and activities that improve health care quality. 42 U.S.C. § 300gg-18(b)(1)(A)(ii). In short, modern insurance regulation is built around a core premise: because policyholders prepay for uncertain future claims, regulators must ensure both fair practices and adequate financial capacity to pay those claims.

19. HCSMs function as insurance under many state laws. Consequently, as a condition of their operation, they are restricted or barred from operating unless they comply with state insurance regulation or qualify for an exemption.

20. Many states have enacted narrow safe-harbor provisions that exempt certain bona fide HCSMs from state insurance laws—if the organization satisfies specific conditions designed to ensure it operates legitimately rather than an unlicensed insurer. For that purpose, several states, including Washington, Illinois, Maine, and New Hampshire, expressly condition that safe harbor on compliance with the federal HCSM definition in 26 U.S.C. § 5000A(d)(2)(B)(ii)(I)–(V). In other states—including Colorado, Connecticut, Oregon, New Jersey, and New York—regulators treated a purported HCSM's failure to meet the federal requirements as a material fact when issuing enforcement orders. Following that path, regulators in Iowa and Michigan demanded evidence that Sharity satisfied federal requirements. Some states impose safeguards more stringent

than the federal definition, such as requiring that members' contributions must be voluntary and requiring that all contributed funds must be held in segregated trust accounts—to prevent commingling, diversion, and insolvency. *See, e.g.,* § 376.1750(3) R.S. Mo. (Missouri).

21.    In addition, many states—approximately 30 in total—further require that member contributions to a sharing ministry must be shared; in other words, they must be paid directly from one member to another, not into an account in the name of the HCSM (or any other entity). *See, e.g.,* O.C.G.A. § 33-1-20(b) (Georgia) ("Provides for the financial or medical needs of a participant through contributions *from one participant to another*") (emphasis added); RSMo.376.1750 (Missouri) ("Provides for the financial or medical needs of a member or subscriber through gifts directly *from one member or subscriber to another*") (emphasis added).

22.    These state-law statutory safe harbors—and consumer confusion surrounding the differences between a "sharing" ministry and "insurance"—created a predictable opportunity for unscrupulous actors to avoid regulation while marketing products that promised the practical benefits of health insurance at a lower monthly cost. That opportunity is precisely what Aliera's founders exploited: they designed and sold insurance-like products under the "ministry" label. Their apparent goal was to collect premium-like monthly payments, without any obligation to provide coverage for medical benefits and while escaping the regulatory oversight, solvency rules, and consumer protections that govern insurance.  In other words, the Aliera insiders set up a scheme whereby they would get paid monthly just like for insurance without having to provide insurance benefits, all under the veneer of a religious "ministry."

23.    Qualifying as a genuine HCSM was vital to Trinity's survival. Neither customers nor key third parties—such as banks—would (or could) do business with an entity selling health benefits that was neither licensed as an insurer nor a genuine HCSM (and therefore potentially

exempt from licensing requirements). Baker knew that. It was Baker's job to know the legal risk of Trinity's failure to qualify as a bona fide HCSM. But Baker was also keenly aware of the business risks: its own documents reflect its knowledge that:

> Call centers are dropping Trinity and going w OneShare b/c OneShare convinced them that ***Trinity is illegitimate b/c it doesn't have the 1999 provision***. That, coupled w states where the individual mandates has kicked in, has caused ***Trinity to be losing ˜1,000 members PER WEEK! We must stop this hemorrhaging ASAP.*** . . . Next, Aliera's VP of Finance & Acctg has been pleading for the 1999 agreement to show banking institutions that Trinity is in compliance. ***The banks, too, are reading the news, and are scared***.

January 28, 2020 email from Trinity's Joe Guarino to Baker's Mark Lange and Jacqueline Menk, with copies to Baker's Derek Bower and Frank Miller (emphasis added).

## B.    Ex-Felon Timothy Moses Forms Aliera to Sell HCSM Health plans.

24.    In 2015, Timothy Moses and his spouse, Shelley Steele, formed Aliera—to which Trinity would later become subservient.  Moses is a financial felon, indicted and convicted of securities fraud and perjury, sentenced to 6.5 years' imprisonment, and ordered to pay $1.65 million in restitution. *United States v. Moses*, No. 1:04-cr-005080CAP-JMF (N.D. Ga.), *aff'd*, 219 F. App'x 847 (11th Cir. 2007). Following his release from prison, Moses was placed on supervised release, which was later revoked after he committed further financial fraud—by failing to provide truthful financial disclosures to his probation officer.

25.    Moses and Steele formed Aliera shortly after he completed his sentence.  Moses and Steele realized its possibilities as a vehicle, made possible by the ACA, for marketing and selling purported HCSM "health plans" to the general public—at prices below ACA exchange plans and seemingly outside the regulatory and consumer protections that apply to bona fide health insurance plans. But to launch that operation, Moses needed a pre-existing, qualifying health care sharing ministry: an entity "which (or a predecessor of which) has been in existence at all times

since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(ii)(IV).

26.    In 2016, Moses lucked out. He located nonprofit Anabaptist Healthshare ("Anabaptist"), a small HCSM serving members of the Mennonite community, primarily in and around Aroda, Virginia.  He persuaded Anabaptist to create Unity Healthshare, LLC ("Unity") as a wholly owned subsidiary of the nonprofit church.  Unity became the vehicle through which Aliera initially marketed and sold HCSM products.

27.    Aliera began selling Unity-branded HCSM products in late 2016, and in February 2017 entered into a definitive agreement with Anabaptist and Unity. Under that agreement, Aliera—not Anabaptist or Unity—created, designed, marketed, and sold the purported health care plans under the Unity name, and administered all claims. Also under that agreement, Aliera—not Unity—collected the monthly "contributions" paid by members. Those "contributions" were deposited directly into a bank account controlled by Aliera and the Moses family. From that account, Aliera and the Moses family controlled the flow of money, deciding what amounts (if any) would be deposited into Unity accounts to pay member medical claims, and what amounts would be retained or diverted for the benefit of Aliera and the Moses family.

28.    Aliera's revenues immediately surged as a result of its Unity relationship. In 2016, Aliera had reported annual revenue of approximately $2.3 million. By 2017, Aliera's annual revenue had increased roughly ten-fold, to more than $23 million. But Moses, Steele, and Aliera had not launched their partnership with Unity for the benefit of Unity, Unity's members, or to provide health insurance. The truth was quickly revealed: by mid-2018, Anabaptist discovered that Aliera was not properly segregating Unity funds and was "keeping as much of the incoming member funds" for Aliera's and Moses's own benefit as he "saw fit." *Aliera Healthcare, Inc. v.*

*Anabaptist Healthshare*, 355 Ga. App. 381, 384, 844 S.E.2d 268, 273 (2020). Anabaptist also discovered that Moses had written himself nearly $150,000 in checks from Unity's operating account.

29.     On July 25, 2018, Anabaptist instructed Aliera to immediately turn over control of Unity's funds to Unity. Aliera refused. Approximately three weeks later, Anabaptist and Unity issued a notice terminating their agreement with Aliera and demanded that Aliera return control over Unity's HCSM plan funds and the Unity HCSM member roster to Anabaptist. Aliera again refused. Aliera and Anabaptist then sued each other in Fulton County, Georgia state court. *Aliera Healthcare v. Anabaptist Health Share, et al.*, No. 2018-cv-3088981 (the "Fulton County Lawsuit").

**C.     After Unity Fires Aliera, Aliera Creates Trinity as a More Tractable and Exploitable Replacement**

30.     As Aliera began losing control of Unity—and, with it, access to millions of dollars in member "contributions" —Aliera and the Moses family created a new entity to replace Unity. Aliera and Moses intended that this new entity would be more captive than Unity and Anabaptist, and would provide Aliera unrestrained access to, and total control over, the money collected from purported HCSM members. Trinity was formed to serve that purpose: a replacement (yet fake) "nonprofit ministry" through which Aliera could continue selling insurance-like products while retaining control of, and draining, the cash collected from unsuspecting members.

31.     Trinity was incorporated as a purported nonprofit entity in Delaware on June 27, 2018. The incorporation papers were prepared and filed at Moses's request. Trinity had no members when it was formed.

32.     On July 3, 2018, again at Moses's request, Aliera's attorneys, who were also working for Trinity,  submitted an application to the Internal Revenue Service seeking recognition

of Trinity as a tax-exempt organization under 26 U.S.C. § 501(c)(3)—a requirement for HCSM status. *See* 26 U.S.C. § 5000A(d)(2)(B)(ii)(I). The attorneys procured Trinity's tax-exempt recognition through a false and misleading IRS application that misrepresented Trinity's purposes and concealed Trinity's relationship with Aliera. The application materials knowingly and/or negligently concealed Trinity's true relationship with Aliera, included misrepresentations, and omitted material facts. For example, the application:

(a) *Failed to disclose Aliera as a for-profit entity that would receive compensation exceeding $50,000 per year. See Exh. 1*, Part V, Question 1c. Aliera had no interest in forming an entity through which it would receive less than $50,000 annually. In fact, Aliera paid itself more than $32 million from Trinity-related funds in the first year-and-a-half of Trinity's existence. Trinity would not have been formed but for its ability to generate compensation to Aliera far in excess of $50,000 per year.

(b) *Failed to disclose that Trinity would compensate independent contractors through non-fixed, revenue-based payments. Id*. at Question 6a. In reality, Aliera's compensation was structured largely as a percentage of the premium-like "contributions" received from members.

(c) *Failed to disclose that Trinity planned to purchase services from its highest-compensated independent contractor—Aliera—on terms that would not be negotiated at arm's length, without a fair-market-value determination.* *Id*. at Question 7a. Instead, the application represented that Trinity would have no contracts or agreements with "highly compensated independent contractors." *Id*. at Question 8a.

(d) *Failed to provide good-faith projections of Trinity's revenues and expenses. Id*., Part IX. The Form 1023 projected annual revenues of less than $700,000 and expenses of less than $600,000 for Trinity's first three years. But Aliera had been receiving tens of millions of dollars annually through Unity-related payments and created Trinity as Unity's replacement. While the IRS

application was pending, Aliera maintained fee schedules premised on Trinity receiving $50 million per year in revenue. Trinity later reported revenues exceeding $90 million and expenses exceeding $38 million.

33.     The 501(c)(3) application was signed by William "Rip" Thead, III ("Thead"). Thead was an Aliera employee, a personal friend of the Moses family, and an individual whom Moses believed he could control.

34.     Aliera's attorneys also drafted a Management and Administration Agreement (the "Management Agreement") between Aliera and Trinity, effective August 13, 2018. This agreement was contemplated prior to submission of Trinity's IRS application. Thead—without independent legal representation—executed the Management Agreement on Trinity's behalf.

35.     The Management Agreement transferred effective control of Trinity's business, finances, and member relationships to Aliera, including in the following ways:

    (a)    all member "contributions" would be made payable to Aliera, not Trinity, and deposited directly into an Aliera-controlled bank account;

    (b)    Aliera would be a signatory authorized to make payments from "each and all banking accounts opened in Trinity's name in connection with this Agreement;"

    (c)    Aliera, "in its sole discretion," would accept or reject member enrollments in Trinity's plans;

    (d)    Aliera would hold "exclusive ownership rights" to the Trinity membership roster;

    (e)    Aliera would be the exclusive point of contact with Trinity's members, and Trinity was prohibited from contacting its own members "for any purpose" without Aliera's prior written consent;

    (f)    Aliera (or its designee) would administer medical claims and determine how much, if anything, would be paid; and

(g)    Aliera would control the costs and fees deducted from member payments.

36.    The Management Agreement's fee structure was highly favorable to Aliera and highly unfavorable to Trinity. For many plans, the structure permitted Aliera to take approximately 65% of member "contributions" off the top. Of the remaining 35%, Aliera extracted additional fees, commissions, and expenses—leaving only about 16% of member "contributions" to be placed in a "Sharebox" for the payment of Trinity members' medical claims. By comparison, the ACA's medical loss ratio requirement generally requires health insurers to spend at least 80% of premium revenue on medical care and quality-improvement activities. 42 U.S.C. § 300gg-18(b)(1)(A)(ii).[2]

37.    Aliera began selling Trinity-branded "health care plans" in mid-August 2018, representing that the plans were "not insurance" and that Trinity was an HCSM. Those claims were false:

(a)    Trinity could not qualify as an HCSM under 26 U.S.C. § 5000A(d)(2)(B)(ii) because Trinity was formed in 2018—long after the statute's December 31, 1999 cut-off date—and had no predecessor ministry that had existed continuously since December 31, 1999 with uninterrupted sharing of members' medical expenses since that date.

(b)    Trinity did not qualify as a bona fide HCSM because it did not operate as a defined faith- or ethics-based ministry whose members "share a common set of ethical or religious beliefs" and share medical expenses "in accordance with those beliefs," as required by 26 U.S.C. § 5000A(d)(2)(B)(ii)(II). Instead, the Trinity-branded products were marketed and sold broadly to the general public, including to anyone who merely professed a generic "belief in God," regardless of denomination, doctrine, congregation, or any shared,

---

[2] Certain amendments to the fee schedule were made in 2019, such that, as Aliera eventually disclosed to Trinity, it credited approximately 18% of member payments to the Sharebox.

concrete set of religious or ethical tenets that actually governed eligibility or the sharing of expenses. That is contrary to the purpose of § 5000A(d)(2)(B)(ii)(II), which Congress included to confine the exemption to cohesive communities bound by specific, operationalized beliefs—not open-ended "religious" branding that any seller of coverage could adopt to evade insurance regulation and the ACA's consumer protections.

(c)   Trinity did not qualify as a nonprofit § 501(c)(3) tax-exempt organization because it was created and operated for substantial non-exempt purposes, including: (i) entering into a related-party marketing and administration relationship with Aliera; (ii) enriching Aliera and the Moses family; and (iii) directly competing with commercial insurers through the sale of insurance-like products. *See* IRS Private Letter Ruling 202213009.

36.   The products Aliera designed and sold were insurance in substance and operation, as regulators and courts have consistently and repeatedly found. The plans were represented as providing defined coverage for preventive care, primary care, labs and diagnostics, telemedicine, prescription drugs, urgent care, specialty care, hospitalization, surgery, emergency room services, and more. Members paid fixed monthly "contributions," dictated by Aliera, as a condition of maintaining "membership" and eligibility for benefits; nonpayment resulted in loss of eligibility. Applicants were required to disclose medical history and could be denied based on underwriting-like screening. Aliera offered tiered "gold," "silver," and "bronze" options, and imposed a deductible-like amount labeled a "member shared responsibility amount" or "MSRA." *See, e.g.*, *McCann, et al. v. The Aliera Companies, Inc.*, No. 1:20-cv-2429-AT, 2021 U.S. Dist. LEXIS 115827, at *48–66 (N.D. Ga. June 22, 2021) (finding the Aliera/Trinity plans were insurance).

**D.   Trinity and Aliera Attract Regulatory Scrutiny and Trinity Retains Defendants.**

37.   Aliera began selling Trinity plans in mid-August 2018. Within weeks, Trinity and Aliera drew scrutiny from state insurance regulators. On October 1, 2018, the Washington State

Office of the Insurance Commissioner ("OIC") served an investigative notice requesting documentation showing that "both Aliera and Trinity have been in existence continuously since December 31, 1999," and that "both Aliera and Trinity have shared medical expenses between HCSM members continuously and without interruption since at least December 31, 1999." The OIC also demanded information regarding the "legal relationship between Aliera and Trinity," and asked what "the functional distinction is between Aliera and Trinity."

38.     After receiving the Washington OIC notice, Aliera initially advised Trinity's CEO, Thead, that Aliera would "take care of it." But Aliera later recognized that Trinity and Aliera needed to create the illusion of independence to regulators and urged Thead to retain separate counsel. Thead retained Defendants Lange and Baker.

39.     On or about November 15, 2018, Thead executed an engagement letter for Baker to represent Trinity "with respect to federal income tax and certain insurance-related regulatory matters."

40.     Baker's representation quickly expanded beyond the scope described in the engagement letter. As Baker and Lange knew, Trinity had only one employee—its CEO, Thead—whom they understood was not a sophisticated businessperson. Baker and Lange knew Trinity lacked an independent board and soon learned Trinity had no personnel with any financial experience. They further learned that Trinity's funds and assets were controlled by Aliera. Against that backdrop, Baker's role grew to encompass substantial portions of Trinity's business, including providing business and financial advice, identifying, vetting and helping to retain vendors, crisis response, corporate governance advice, and negotiating and drafting contracts. Defendants' role was not merely tax and regulatory guidance. Lange performed or directed, coordinated, and supervised this work.

41.    In 2019, Baker's representation expanded to include at least the following:

(a)    Attending the evidentiary hearing in the Fulton County Lawsuit between Aliera and Anabaptist in January 2019;

(b)    Responding to a grand jury subpoena from the U.S. Attorney from the Northern District of Georgia;

(c)    Entering into a joint defense agreement with Aliera;

(d)    Advising on hiring a second employee and drafting an employment agreement;

(e)    Reviewing banking forms on behalf of Trinity;

(f)    Locating an accounting firm to prepare Trinity annual Form 990, and advising on engagement letters with accountants;

(g)    Advising on responding to press inquiries;

(h)    Advising regarding "building a corporate reorganization strategy for Aliera and Trinity;"

(i)    Advising on corporate governance issues;

(j)    Contract negotiations; and

(k)    Identifying an individual to serve as an independent director.

42.    Throughout this period, Baker staffed Trinity's matters with numerous partners and attorneys across practice areas—including white collar defense, health care, ERISA, intellectual property, employment, employee benefits, HIPAA, and health care compliance—each providing legal services to Trinity and billing Trinity for their time. As Baker told a regulator in early 2020, "[o]ver the course of the past several months, and *under the guidance of outside counsel*, Trinity Healthshare Inc. ('Trinity') has substantially reorganized its leadership, organizational documents and its vendor relationships . . .." (emphasis added). In just one of the "several months" leading up

to that communication, Baker charged $244,996.05 for the work of 28 different timekeepers at a company with just three employees.

**E.    Defendants Knew or Should Have Known that Trinity Was Used By Aliera to Carry Out Fraud.**

43.    From the outset of the engagement, Defendants knew that Trinity had obtained its IRS § 501(c)(3) determination letter—a prerequisite to HCSM qualification—on false pretenses and knew or should have known that the determination letter could not be relied upon. IRS guidance makes clear that "a determination letter can't be relied on if it is based on any omission or inaccurate material information submitted to the organization." IRS Publication 557 (2018) at 6 (citing Rev. Proc. 2018-5 § 11). Defendants knew Trinity's application was materially false and misleading because, among other things, it failed to disclose Trinity's true relationship with for-profit Aliera and the degree of Aliera's control over Trinity. Indeed, Defendant Lange concluded soon after the engagement began that if the IRS had known of Aliera's control over Trinity, including control of Trinity's cash receipts and cash flow, it would not have issued the determination letter.[3] Lange was likewise "convinced that the IRS would not have granted Trinity tax-exempt status if it had been provided a copy of [the Management Agreement]."[4]

---

[3] In a January 24, 2020 email Lange wrote: " . . . the [I.R.S.] Form 1023 was filed on July 3, 2018 and August 13, 2018 [the] Aliera contract [was] signed . . . but the [I.R.S.] application never said how Trinity would handle the adm, selling etc. or that it would contract all that out with a for profit turn key manager and effectively sharing revenue with that vendor. ***Trinity's plans were not disclosed. . . . Based on the contract, I have said repeatedly to Rip [Thead] starting in November 2018, if the IRS had seen the contract, Trinity would NOT have been granted Section (c)(3) [sic] status at all. I firmly believe that still***." (bold, italics added).

[4] In a June 6, 2019, email from Mark Lange to seven other attorneys at Baker, he wrote, "As you know, the IRS also did not receive a copy of the August 13, 2018 Management and Administration Agreement with Aliera to review as part of their analysis of Trinity's application for tax-exempt status. ***I remain convinced that the IRS would not have granted Trinity tax-exempt status if it had been provided a copy of that agreement.*** I acknowledge that Aliera will argue that it was not [executed] on the filing date by Burr & Forman. However, they cannot say that this document was not contemplated by them at that time." (bold, italics added).

44.     Defendants also knew, soon after commencing their representation, that Trinity could never qualify as an HCSM because it was not formed until 2018, had no predecessor organization, and had no members before it was formed—facts fundamentally incompatible with the federal HCSM definition, as well as many state definitions.

45.     In November 2018, Washington state's Office of the Insurance Commissioner demanded that Trinity "[p]rovide documents which demonstrate Trinity (or a predecessor organization) has both (1) been in continuous existence since at least December 31, 1999, and (2) shared medical expenses between HCSM members continuously and without interruption since at least December 31, 1999." Defendants drafted Trinity's response. They could not provide any evidence of Trinity's (or any predecessor's) existence since 1999 or continuous sharing since that date. Instead, Defendants responded that "[w]e believe the response to this question is contingent on the certification determination currently underway by [CMS]" (emphasis added). By February 2019, Baker knew that CMS would not issue a certificate to Trinity recognizing it as an HCSM. Despite this, and with Defendants' knowledge and assistance, Trinity continued to hold itself out as a "recognized" HCSM, collecting millions in premiums from members. Likewise, in a class action filed against Trinity and Aliera in federal court in Washington, Defendants (appearing for Trinity) were unable to provide any evidence that it was in existence on or before December 31, 1999. As the Court concluded: "Defendant Trinity has failed in its motion to address, let alone dispute, Plaintiffs' allegation that neither Defendant was in existence as of December 31, 1999, as required by the ACA exemption provisions." *Jackson v. Aliera Cos., et al.,* 462 F. Supp. 3d 1129, 1134 (W.D. Wash. 2020).

46.     Baker and Lange knew, or should have known, that Trinity could never qualify as a legitimate HCSM exempt from insurance regulation in most states where Trinity-branded

products were being sold. Despite that knowledge, Defendants continued to work in ways that enabled Trinity to maintain and expand operations, including collecting hundreds of millions of dollars from members under the false representation that Trinity was a valid HCSM.

47.    Defendants' role also expanded into *de facto* operational control of Trinity. Defendants knew Trinity had only one employee—CEO Thead—whom Defendants understood was unsophisticated and in over his head. Defendants knew Trinity lacked an independent board and had no controller, CFO, or employee or consultant with financial expertise. Yet Baker assigned extensive staffing to Trinity matters—at times with as many as 28 timekeepers billing in a single month.

48.    Trinity was used as an instrumentality of the fraud perpetrated by Aliera and its insiders and Defendants knew that. They knew that:

(a)    Trinity lacked meaningful independent governance, internal controls, or financial infrastructure. Trinity had minimal personnel, lacked a CFO/controller function, and depended on Aliera for the information necessary to understand Trinity's finances, claims liabilities, and cash flows.

(b)    Trinity's structure and contracting were designed to deny Trinity control over its own funds, member roster, and claims process and to concentrate practical control in Aliera and its insiders.

49.    Defendants knew these facts early in the engagement and understood that Aliera—not Trinity—controlled cash receipts, cash flow, claims administration, and the membership roster, and that Trinity's leadership lacked the sophistication and information necessary to independently supervise or countermand Aliera's conduct.

50.    To the extent any Aliera insiders engaged in wrongdoing, such conduct was adverse to Trinity's interests and served Aliera's and insiders' interests at Trinity's expense. Trinity was

the victim of the scheme and was used as the public-facing vehicle through which others extracted and diverted member funds.

51.     Plaintiff's claims seek redress for harms suffered by Trinity and the estate from Defendants' breaches of duty in advising, enabling, and prolonging unlawful operations and in failing to timely counsel cessation and mitigation—harms that are independent of, and not excused by, the misconduct of Aliera and its insiders.

52.     Defendants knew Trinity had no meaningful operational infrastructure, lacked internal controls, and had no staff capable of detecting fraud or monitoring the handling of member funds.

53.     Defendants knew Trinity had no control over the claims process, which was wholly controlled by Aliera.

54.     Defendants knew—because they did the math themselves—that the fee structure in the Management Agreement left insufficient funds to pay members' claims and that the fees Trinity was obligated to pay under that Agreement exceeded fair market value. In January of 2020, for example, a Baker attorney performed the computation and concluded that "if you calculate up the various fees Trinity paid Aliera from the percent of MSC ["member sharing contributions" or premiums] they kept . . . Trinity keeps 35% but then pays Aliera 54.2% out of that 35% so that works out to Trinity keeping only 16.03% of the MSC."

55.     Defendants also knew that Aliera and the Moses family were untrustworthy and could not be trusted with Trinity's funds. A Baker attorney attended a two-day evidentiary hearing in the Fulton County Lawsuit between Aliera and Anabaptist in January 2019. Evidence presented at that hearing included, among other things: (1) Timothy Moses's felony convictions for securities fraud and perjury; (2) Moses's unauthorized self-payments totaling nearly $150,000 from Unity-

related accounts; (3) the deposit and commingling of all Unity member funds into a single Aliera bank account; (4) Aliera's false statements to a state insurance regulator that it was segregating Unity plan funds; and (5) Aliera's practice of keeping as much of incoming member funds for its own benefit as it "saw fit." *Aliera Healthcare, Inc. v. Anabaptist Healthshare*, 355 Ga. App. 381, 384, 844 S.E.2d 268, 273 (2020). In April 2019, in a written decision that Defendants read, the Fulton County court appointed a receiver to oversee Unity's HCSM plans and plan assets, finding, among other things, that: (a) Aliera owed a fiduciary duty to Unity and likely breached it; (b) Aliera demonstrated a lack of transparency regarding Unity plan funds; (c) Aliera's conduct "evinces a threat of misappropriation of the plan assets;" and (d) Aliera's failure to account for Unity funds supported receivership to protect Unity and its members from further looting.

56.     Defendants further knew that Aliera was in breach of the 2018 Management Agreement. The Agreement required Aliera to "obtain a valuation from an independent appraiser to ensure the payments from Trinity to Aliera for Aliera's services under the Agreement are fair market value for purposes of [IRS] rules and regulations governing excess benefit transactions in connection with non-profit organizations." Defendants knew by at least July 2019 that Aliera had failed and refused to obtain that valuation.

57.     In February 2019, Trinity was served with a federal grand jury subpoena issued through the U.S. Department of Justice in the Northern District of Georgia. A senior Baker white-collar defense partner then became involved in Trinity's representation.

58.     Defendants knew that on May 13, 2019, Washington's OIC issued a cease-and-desist order against Aliera and Trinity, finding that they were violating Washington insurance law and ordering them to immediately cease selling new plans to Washington residents. The Washington OIC determined that Trinity did not meet the federal or state definition of an HCSM,

that Trinity was created in 2018 for the very purpose of entering into a marketing agreement with for-profit Aliera, and that Trinity and Aliera were selling insurance without authorization. By year-end, Baker knew Trinity would not prevail on appeal, advised Trinity to settle, pay a substantial fine, and cease doing business in Washington. Defendants knew that other states would likely follow suit.

59.    Defendants knew that in July 2019 the State of Texas filed an amended complaint against Aliera alleging that the Trinity plans were non-exempt insurance plans and that Aliera misrepresented its relationship with Trinity. In Defendant Lange's words, the suit cast Aliera "in a very negative light."

60.    Defendants further knew that, beyond Washington and Texas, an increasing number of regulators began investigations or issued cease-and-desist orders in 2019, including regulators in Arizona, Colorado, Connecticut, Florida, Iowa, Missouri, New Hampshire, North Carolina, and Oregon. These regulators cited or sought information regarding Trinity's formation issues, its relationship with Aliera, its claim that it was not selling insurance, and the percentage of members' payments used to pay medical claims.

61.    In responding to state regulators' investigative demands, Baker made material misrepresentations and omissions on Trinity's behalf, including mischaracterizing Trinity's purpose and operations, minimizing Aliera's control, and obscuring the economic reality that the program could not pay reasonably expected medical claims. For example:

> (a)    Washington's OIC specifically asked Trinity the following: "Was Trinity, as a legal entity, created for the express purpose of entering into a corresponding marketing agreement with Aliera?" Defendants knew that the answer to the question was an unambiguous "yes." Yet, in a letter drafted by Defendants for Trinity to send to the regulator, they denied that it was created for such a purpose, representing instead that "Trinity was organized exclusively for

charitable and religious purposes under section 501(c)(3) of the U.S. Internal Revenue Code." The Washington OIC noted its denial: "Trinity denied it was created for the express purpose of entering into a corresponding marketing agreement with Aliera." Defendants' statement was false and misleading and was designed to permit Trinity to continue operations as an HCSM when Defendants knew it did not qualify to do so.

(b)   Defendants would distribute a document titled "The Affordable Care Act's Definition of a Health Care Sharing Ministry" to regulators and others that falsely claimed that "Sharity Ministries is proud to uphold the longstanding tradition of sharing members' medical expenses continuously, without interruption, since 1997" and "Sharity Ministries conducts an annual audit by an independent certified public accounting firm, which is made available to the public upon request." These statements were false and/or misleading and were made in an effort to permit Trinity to continue to exist in order to collect premiums from members and for Defendants to bilk fees from the insolvent entity. Defendants knew that these statements were false and/or misleading.

(c)   The member "sharing" allegedly worked through a "Sharebox" that Aliera created – a purported mechanism whereby members could approve or reject certain "sharing" requests—the very hallmark of a HCSM. Regulators who asked about exactly how members shared directly with one another were informed by Baker that a "Sharebox" algorithm would match people in order to facilitate "gifts" from one to another. The Sharebox was represented by Baker to regulators as meeting the "member sharing" requirement because it was a process by which an individual member could go on a webpage and "approve" or "disapprove" of a suggested sharing request. Baker learned from Aliera, however, that members were ***never informed*** of this webpage and that "share" requests were automatically approved without any member input after three days. Despite this knowledge, however, Baker continued to mislead regulators as to how the Sharebox system functioned, never informing them of the truth: that members were not involved in any capacity in "sharing" medical expenses as required by states' laws.

62.     Likewise, in litigation Baker made material misrepresentations and omissions on Trinity's behalf, including but not limited to (1) procuring and presenting a report purporting to show that fees paid to Aliera and its vendors were at Fair Market Value when, in fact, those services were far in excess of FMV, (2) procuring and presenting opinions that Aliera and Trinity were not "related" parties when Defendants knew they were, (3) and making false and/or misleading statements concerning Trinity's "acceptance" by the federal government as an HCSM (when no such "acceptance" ever occurred), and other statements and omissions designed to mislead and obscure the true relationship between Aliera and Trinity.

63.     Additionally, when Baker learned that Aliera's representations to regulators, courts, and vendors regarding its relationship to Trinity were false or misleading, Baker failed to correct those statements. For example, Defendants knew about and did not correct Aliera's false claims that:

(a)     Health care plans sold in Trinity's name were "not insurance," when in substance they were unauthorized insurance sold in violation of state insurance laws;

(b)     Aliera falsely claimed Trinity was an HCSM even though Trinity could not qualify because it was formed in 2018 and had no predecessor satisfying the federal requirements;

(c)     Trinity qualified as a § 501(c)(3) tax-exempt organization, even though Trinity would not have received that designation had the IRS been told the truth about Trinity's relationship with Aliera and Aliera's control;

(d)     Trinity qualified as a HCSM despite the fact that it did not meet the requirement that members share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs, as state regulators specifically concluded;

(e)   Aliera's Sharebox algorithm was structured so that Trinity's members directly shared medical expenses when, in fact, the members had no involvement whatsoever in the purported "sharing" process; and

(f)   No more than 40% of "contributions" would be used for administrative expenses. In fact, the Management Agreement permitted as much as 84% to be consumed by fees, expenses, and commissions.

## F.   Defendants Negligently Failed to Advise Trinity to Cease Complicity in Aliera's Scheme

64.   Defendants knew that Trinity was operating illegally. Trinity—whose financing, operations, and programs were controlled by Aliera—could not qualify as a legitimate § 501(c)(3) tax-exempt organization or as an HCSM. Trinity had delegated to Aliera the marketing and administration of purported "health care" plans that bore all the hallmarks of insurance, and an increasing number of state insurance regulators were taking action. Trinity had no meaningful control over its finances, which were controlled by an entity that courts and regulators had found to be untrustworthy. Defendants knew, or at a minimum should have known, that Trinity could never be made "legitimate" under the law.

65.   As soon as Defendants understood that Trinity was insolvent and could not meet the requirements of a genuine HCSM, they should have advised Trinity to stop selling plans, cease operations, and promptly inform members to obtain lawful alternative coverage that would have covered their health care needs. Instead, Defendants took steps designed to conceal Trinity's inherent illegality and prolong Trinity's continued operations. Specifically, and in conscious disregard of their duties and of the harm sure to result, Defendants took numerous steps to allow Aliera to continue to use Trinity to defraud Trinity's members by selling them illegal, unauthorized, fake health insurance.

66.     Had Defendants exercised reasonable professional care, they would have advised Trinity's decision-makers—promptly and unequivocally—no later than the early phase of the engagement that: (i) Trinity could not qualify as an HCSM under federal law; (ii) Trinity's § 501(c)(3) status was obtained through material misrepresentations, could not be safely relied upon, and was not a basis upon which Trinity could keep selling plans; (iii) Trinity's operating model was illegal and unsustainable in light of regulators' actions and Trinity's insolvency; and (iv) Trinity should cease selling and administering the plans, provide member notice, preserve and marshal the remaining assets for the benefit of members and creditors, and unwind unlawful contractual relationships.

67.     Instead, Defendants advised and implemented strategies that prolonged continued operations, including negotiating and papering revised contracts, advancing misleading narratives to regulators, courts, and other stakeholders, and procuring and knowingly using false audits/tax filings/valuations to support continued operations. As a direct and proximate result, Trinity continued collecting premium-like payments and accumulating member claim liabilities, all while Defendants continued to collect excessive fees.

68.     As a direct consequence of Defendants' actions and omissions, Trinity—through Aliera—continued selling unlawful plans through 2021.

69.     As a direct result, Trinity members paid $346 million for fraudulent health care plans from Baker's representation until July 8, 2021, when Trinity, by then called Sharity, filed for bankruptcy, and Sharity became liable for that amount to its creditors, who are nearly entirely Sharity members.

70.     As a further result, Trinity/Sharity members' unpaid health care claims continued to grow.  At the end of 2019, there was a backlog of $22.8 million in fully adjudicated and approved

Trinity member claims that had not been paid. By the time it filed for bankruptcy on July 8, 2021, that number had grown to over $50 million.

**G.    Defendants Negligently Negotiated and Advised Trinity on Five Contracts that Further Enmeshed Trinity in Aliera's Scheme.**

71.    In mid-2019, Aliera restructured its operations. It formed four subsidiary entities—Advevo, LLC ("Advevo"), USA Benefits & Administrators, LLC ("USABA"), Tactic Edge Solutions, LLC ("Tactic"), and Ensurian Agency, LLC ("Ensurian") (collectively, the "Aliera Subsidiaries")—through which it proposed to continue conducting the business it had previously conducted directly. Aliera continued to operate Trinity's business through the Aliera Subsidiaries by dividing among those entities the same core functions Aliera had performed under the 2018 Management Agreement: sales through Ensurian, claims administration through USABA, marketing through Advevo, and technology/compliance services through Tactic.

72.    In June 2019, Aliera's counsel drafted five proposed contracts and transmitted them to Defendants, emphasizing Aliera's desire that they be executed promptly.

73.    Defendants recognized that the fees payable to the Aliera Subsidiaries under the proposed contracts were problematic. Trinity had no accountant or other person with financial expertise capable of independently analyzing the numbers. Defendants also knew there were ongoing issues with the "flow of funds" and the "proper segregation of Sharebox funds." Defendants further knew that bona fide insurers typically spent less than 20% on administrative costs and bona fide HCSMs typically spent approximately 25–30% on administrative costs, whereas the proposed contracts would require that approximately 65% of member payments be diverted to the Aliera Subsidiaries in the form of fees and commissions.

74.    By November 2019, Trinity had three directors. Thead continued as Trinity's CEO and served on the board; Joseph Guarino was hired as Trinity's president and also served on the

board; and Christopher Sizemore—found and recommended by Baker—joined as an "independent" director.

75.    On December 4, 2019, Thead executed, on Trinity's behalf, five contracts—one each with Ensurian, USABA, and Advevo, and two with Tactic—effective January 1, 2020 (the "2020 Contracts"). Thead, Guarino, and Sizemore (collectively, the "Directors") approved and consented to the 2020 Contracts. Each contract carried a five-year term. Collectively, the 2020 Contracts replaced the 2018 Management Agreement.

76.    Trinity's Directors placed great confidence in Defendants and relied on Defendants for guidance across Trinity's affairs, including whether to execute the 2020 Contracts. Defendants should have advised the Directors not to enter into the 2020 Contracts.

77.    Instead, Trinity's Directors—assisted by Defendants and relying on Defendants' advice—approved the 2020 Contracts without adequate diligence. In particular, they failed to determine, among other things: (i) whether the services to be provided under the 2020 Contracts could be obtained elsewhere for less; (ii) whether Aliera was financially able to repay the massive outstanding liability it already owed Trinity; and (iii) the amount of the backlog of approved member claims, and how that backlog would be funded and paid under the new contractual structure.

78.    Defendants negligently and wrongfully negotiated, drafted, and advised Trinity regarding the 2020 Contracts. Those contracts failed to achieve Trinity's stated objectives—namely, to control finances and the member roster, and achieve meaningful independence from Aliera.

79.    The 2020 Contracts did not provide Trinity control over member funds. Even after the 2020 Contracts became effective, member funds continued to flow into accounts controlled by

Aliera or its Subsidiaries. The 2020 Contracts did not establish who would control member funds after receipt and before any portion was deposited into a Sharebox account to pay claims. Although the 2020 Contracts referenced an "internal control policy" that would govern deposits, no such policy was ever created or articulated. As Defendants recognized after the 2020 Contracts took effect, Trinity did not know where member payments were deposited or which entity controlled those funds. Baker later admitted: "there is no agreement between Trinity and the Aliera Companies governing member fees and contributions from the time those funds leave each member until some portion of those funds is deposited into the Sharebox Account. Trinity has little to no oversight of these funds and no control over any of the funds until Aliera transfers some portion of them." Although the 2020 Contracts were theoretically intended to secure financial and accounting independence from Aliera, by October 2020 Lange acknowledged that under the "current contractual arrangements," it was "likely impossible" to achieve that control.

80.     In reality, the 2020 Contracts imposed unreasonable and inadequately vetted fees on Trinity. Trinity did not analyze whether the services charged by the Aliera Subsidiaries could be obtained elsewhere for less, and it did not solicit competitive bids. Instead, Aliera dictated the fees. Aliera presented the fee structure through byzantine schedules that made it difficult to determine whether the fees were fair. Trinity relied on Aliera's representations that the fee structure meant: 35% of member payments to Ensurian for commissions; 25% to the other Subsidiaries for their fees; 10% to Trinity for its operating costs (consisting largely of payments to Baker); and only 30% deposited into Sharebox for claims. Even if those representations were accurate, Defendants knew or should have known that allocating only 30% of member payments for claims was inadequate and incompatible with the promise of meaningful "health coverage." Defendants also knew or should have known that it was imprudent to approve long-term contracts

on those terms without independent financial validation. Instead, Defendants relied on a valuation that, as alleged below, was flawed and did not address whether comparable services were available at lower cost.

81.     The 2020 Contracts did not require repayment or security for Aliera's debt to Trinity. By the end of 2019, Aliera owed Trinity more than $20 million. Trinity conducted no meaningful diligence regarding Aliera's ability to repay this debt before executing the 2020 Contracts. Defendants did not counsel them to do so. Defendants were negligent by failing to investigate Aliera's financial condition, failing to advise Trinity to require repayment before executing the 2020 Contracts, and failing to advise, at minimum, that Trinity require Aliera to secure its obligations to Trinity.

82.     The 2020 Contracts did not require accurate disclosure or funding of backlogged claims. By the end of 2019, Aliera was sitting on more than $20 million in Trinity member claims that had been fully adjudicated but not paid. Defendants and the Directors failed to conduct adequate diligence regarding the amount and age of the backlog. The 2020 Contracts negligently failed to require Aliera or its Subsidiaries to make representations, warranties, or disclosures regarding prior claims administration, the magnitude of unpaid claims, or whether sufficient funds were being held to pay those claims.

83.     The 2020 Contracts did not impose accountability for Trinity's illegal creation and the resulting harm. Aliera and its insiders created Trinity in 2018 to use it as a vehicle for the scheme described above. By late 2019—before execution of the 2020 Contracts—Trinity had already been targeted by multiple regulatory actions and lawsuits, and Trinity was being forced to expend substantial sums on legal fees, defense costs, and fines because of the manner in which Aliera created and managed Trinity. Defendants and the Directors nevertheless failed to take

reasonable steps to hold Aliera accountable, to obtain indemnification, to secure reimbursement, or to restructure in a manner that protected Trinity from continuing liabilities caused by Aliera's conduct.

84.     The 2020 Contracts failed to give Trinity meaningful control over its member roster. Although the 2020 Contracts were intended to shift ownership of the membership roster to Trinity and nominally stated that Trinity owned the roster, the contracts failed to provide Trinity with practical access and control.  Rather, Aliera and its Subsidiaries continued to possess, manage, and control the roster.

85.     The 2020 Contracts failed to assuage regulators and did not deter enforcement. The 2020 Contracts did not prevent regulatory action because, as Defendants knew, those contracts failed to address the inherent flaws in Trinity's creation and only obscured Aliera's (and its insiders') ongoing raiding of member funds. Defendants knew that the 2020 Contracts kept Trinity in business longer, while allowing Aliera and its insiders to continue to profit from the scheme. Regulators agreed:

(a)     For example, on July 7, 2020, the Iowa Insurance Commissioner charged Trinity and Aliera with selling unauthorized insurance and engaging in unfair or deceptive acts or practices. With respect to the 2020 Contracts, the Commissioner alleged: "[T]he new contracts work to further obscure and complicate the corporate structure and management of both Aliera and Trinity's businesses. The scheme of having four separate entities to do the work that was previously covered by one is complicated by design in order to evade regulation and responsibility. . . . The creation of the four subsidiaries was for the purpose of promoting the illegal sale of unauthorized health insurance and the four subsidiaries are mere sham corporations intended to shield the parent company, Aliera, from liability and regulation." Defendants were active participants in the drafting and execution of the contracts.

(b)  Similarly, on October 20, 2020, the New York Department of Financial Services charged Aliera and Trinity with violating New York insurance laws and engaging in unfair and deceptive practices. The charges alleged that Aliera restructured in 2019—after enforcement actions by multiple states—"solely in an attempt to continue its avoidance of insurance regulation and its deceptive marketing of Trinity's health care plans as alternatives to traditional health insurance for its own profit." The Department further concluded: "Aliera's restructuring was a half-baked attempt to disguise Aliera's control over Trinity and Aliera's financial benefit therefrom." Defendants actively participated in that "half-baked" attempt, and failed to properly advise their client.

(c)  In a lawsuit filed in January 2022, the California Attorney General similarly alleged that the 2020 Contracts "did little to change the relationship between Aliera and Trinity or the distribution of members' contributions between what Aliera kept and the paltry sum it left to pay for members' requests."

## H.  Defendants Provided Misinformation to Assert Trinity's Legitimacy.

### 1.  Defendants misinformed Trinity's outside accountants in order to procure a misleading audit and Form 990.

86.  Federal law requires HCSMs—and many states likewise require entities claiming HCSM status—to obtain an annual audit prepared by an independent certified public accountant and to make that audit available to the public upon request. Multiple state regulators investigating Trinity, and corresponding with Baker, demanded copies of Trinity's most recent audit.

87.  Separately, a nonprofit entity recognized as tax-exempt under 26 U.S.C. § 501(c)(3) must file an annual Form 990 with the Internal Revenue Service to maintain its tax-exempt status. The Form 990 must also be made publicly available. As a practical matter, the audit and the Form 990 are the core public-facing financial disclosures for an organization like Trinity, and they were

central to how regulators, members, and the public would evaluate Trinity's legitimacy and financial stability.

88.     Under the 2018 Management Agreement, Aliera and Trinity were to have simultaneous audits performed by the same accounting firm. Aliera selected Carr, Riggs & Ingram ("CRI"), an accounting firm with which it had an existing relationship, and Thead signed CRI's engagement letter on Trinity's behalf. Lange insisted that Trinity retain a different accounting firm to prepare and file Trinity's Form 990. Trinity therefore retained Windham Brannon, the accounting firm Lange recommended, to prepare and file its Form 990.

89.     Defendants knowingly assisted Trinity in procuring a misleading audit by encouraging CRI to adopt—and by failing to correct—false assumptions material to the audit. Chief among those assumptions was that Aliera and Trinity were not "related parties."

90.     Under GAAP, when one company (here, Aliera) can "significantly influence the management or operating policies of the other" (here, Trinity) "to an extent that" the other entity "might be prevented from fully pursuing its own separate interests," the entities are "related parties," and that relationship must be disclosed. FASB ASC 850-10-50.

91.     Lange's own assessment was that Aliera's control over Trinity made it "frankly pretty hard to rebut" that Aliera and Trinity were related parties, given the express terms of the Management Agreement through which Trinity surrendered control over its finances and operations to Aliera. Aliera controlled Trinity's cash receipts and cash flow and was treating Trinity as an "intercompany" subsidiary rather than an independent organization in the financial statements Aliera prepared and provided to the auditor.

92.     Lange also understood that truthful related-party disclosure would accelerate scrutiny of Trinity's legitimacy and lead to its demise. He noted that such disclosure could require

negative footnotes in the audit and would likely require disclosures on Trinity's Form 990—disclosures that would be "bad for the world to see." As Lange wrote, "Imagine that the Form 990 reader reads … that Trinity pays millions in management fees to ITS RELATED FOR PROFIT PARTY." (Capitalization in original.)

93.     To avoid these disclosures and to conceal the true relationship from regulators, the press, members, and other stakeholders, Lange decided "to really push" Trinity's accountants. He "dodged" the related-party conclusion with CRI by "argu[ing]" that Trinity could purportedly terminate its arrangements with Aliera with 270 days' notice and thereby regain control—an argument Lange knew, or should have known, was simply false. The Management Agreement had a five-year term; it could not be terminated on 270 days' notice. At most, the notice provision applied to avoiding an otherwise automatic renewal.

94.     CRI completed Trinity's 2018 audit on or about November 7, 2019. Before issuing the audit, CRI required Thead and Guarino to execute a Management Representation Letter. Lange reviewed and discussed that letter with CRI and then advised Thead and Guarino to sign it. The letter required Thead and Guarino to represent, among other things, that (i) the financial statements prepared by Aliera and provided to CRI were fairly presented in accordance with GAAP, and (ii) the recorded membershare benefits liability was adequate to satisfy Trinity's ultimate liabilities. Defendants knew that neither Thead nor Guarino had control over, or reliable access to (or even saw), the underlying financial information or the membershare liabilities necessary to make those representations, because that information was controlled by Aliera, and Trinity lacked internal accounting capacity. Nevertheless, Defendants pushed Trinity to sign because CRI would not issue the audit without the representations. As Lange explained to Trinity's new board member, Sizemore, Trinity was "under a deadline to get these posted on its website. An NPR reporter has

been asking for them for a week now and we need to post them Monday morning for both federal and state reasons." Defendants understood Trinity needed the audit to project legitimacy and they were willing to compromise their duties of loyalty, candor and honesty to obtain it.

95.     Defendants took similar steps with Windham Brannon. Lange "really push[ed]" Windham Brannon "to get there" and persuaded it not to disclose Aliera as a related party on Trinity's Form 990, thereby avoiding the need to file what Lange called a "dread" excess-benefit transaction form. Lange and Baker knew full well that Trinity and Aliera were related parties.

96.     Windham Brannon's ***draft*** Form 990 correctly included Schedule L ("Business Transactions Involving Interested Persons") and correctly disclosed Aliera as Trinity's "Founder" and an interested person. Lange, however, persuaded Windham Brannon not to include Schedule L and not to disclose Aliera as Trinity's founder, despite knowing that "many people will review this return, including regulators apart from the IRS."

97.     Windham Brannon filed Trinity's 2018 Form 990 with the IRS on November 15, 2019. Due to Lange's "pushing," the version filed omitted Schedule L and did not properly disclose Aliera as an interested person.

### 2.    Defendants Procured a Sham Fair Market Value Opinion to Legitimize the Tax Filings and 2020 Contracts

98.     Early in its representation of Trinity, Lange on behalf of Baker concluded that Trinity's payments to Aliera under the Management Agreement were grossly excessive.

99.     At the same time, Baker and Lange understood that, to protect Trinity's tax-exempt status, Trinity needed an appraisal reaching the opposite conclusion—*i.e.*, an opinion that Trinity's payments to Aliera did not exceed fair market value. Without such an appraisal, Defendants knew Trinity would have "no basis to sign its Form 990 tax return for calendar year 2018" and that, "if

and when audited," Trinity would likely lose its tax-exempt status, after which both Trinity and Aliera would "not be able to operate."

100.    After spending "a lot of time" shopping for an appraisal firm and "getting them to understand the valuation needed," Lange selected VMG Health. Baker—not Trinity—retained VMG Health. VMG Health executed an engagement letter with Baker on or about September 20, 2019. The engagement contemplated valuation of both the 2018 Management Agreement and the contemplated replacement arrangement Lange was negotiating on Trinity's behalf with Aliera that would later become the 2020 Contracts.

101.    Defendants knew that VMG Health would necessarily depend on information supplied by Aliera to conduct any valuation, because Trinity "has no infrastructure," had only two employees, and VMG would "have to spend a lot of time with Aliera folks to understand the business."

102.    VMG Health relied entirely on financial and operational data supplied by Aliera in performing its valuation. That information was provided directly to VMG Health, without meaningful verification through Trinity or Baker and without the independent controls that would be expected where related parties are involved and where the counterparty has a demonstrated history of misconduct. Aliera had every incentive to provide data and assumptions that would justify the high fees it was extracting under the Management Agreement and intended to extract under the 2020 Contracts. Defendants knew, or should have known, that the inputs on which VMG would rely were not trustworthy or reliable.

103.    Lange pushed to obtain a draft summary of VMG's conclusions before Trinity's Form 990 was filed on November 15, 2019. The draft summary, received in November of 2019,

opined that neither "the historical arrangement" nor the "upcoming arrangement" between Trinity and Aliera exceeded fair market value.

104.    Lange forwarded that summary to Windham Brannon for use in finalizing Trinity's Form 990, writing that "we thought [the 2018 'bad' agreement] had Trinity pay more than FMV to Aliera but VMG has thankfully said no."[5] Trinity entered into the 2020 Contracts with Aliera a few weeks after receiving VMG's summary.

105.    VMG Health delivered its complete valuation report to Defendants on or about January 22, 2020.

106.    Defendants knew or should have known that VMG's valuation was unreliable and provided no reasonable basis to conclude that (i) the fees paid to Aliera under the Management Agreement were reasonable, or (ii) Trinity had performed adequate diligence to enter into the 2020 Contracts, for at least the following reasons:

(a)    *Wrong legal framework*. VMG was asked to assess the fair market value of payments from a § 501(c)(3) entity to a for-profit counterparty—an issue central to Trinity's compliance with the Internal Revenue Code's prohibitions on private inurement and impermissible private benefit and to Trinity's ability to preserve its tax-exempt status. Instead, VMG applied (and/or framed its analysis through) an inapposite Medicare compliance lens—focusing on concepts associated with the Anti-Kickback Statute and the Stark Law—rather than the relevant question of whether Trinity was paying reasonable, market-rate compensation for services and whether the arrangement jeopardized Trinity's exemption. Baker knew, or should have known, that this was the wrong analysis.

(b)    *Unverified and contradictory inputs from an untrustworthy counterparty*. VMG relied on cost and profit-margin information supplied by Aliera, whom

---

[5] November 14, 2019 email from Lange to Carlye Dooley of Windham Brannon.

Defendants knew to be wholly unreliable. For example, VMG accepted Aliera's model reflecting a profit margin of 10.3%–19.5%, despite the fact that Aliera provided Trinity with other analyses showing far higher margins— *e.g.,* that Aliera's profit margin under the 2018 Agreement was approximately 47%.

(c)    *False arm's-length assumption*. VMG expressly assumed the Management Agreement was the product of arm's-length negotiation, stating that that was an assumption upon which its analysis relied. Baker knew that assumption was simply false: Trinity was created by Aliera and its insiders, lacked independent governance and negotiating leverage, and executed the Management Agreement without independent counsel. Baker did nothing to correct what it knew to be an erroneous assumption.

(d)    *Irrelevant comparators and failure to test alternatives*. VMG compared Aliera's margins to publicly traded companies and did not meaningfully address the real due-diligence questions for Trinity's Directors: whether Trinity could (i) hire and train staff to perform the same functions for less (as Defendants knew other HCSMs did), or (ii) obtain comparable services from independent third-party vendors at materially lower cost. Baker knew, or should have known, that VMG's analysis was therefore faulty.

(e)    *Improper "best option" assumption*. VMG's analysis **expressly assumed** that the Trinity–Aliera arrangements were "the best fiscal option." Whether those arrangements were even reasonable—much less "the best"—was the very question the valuation was supposed to evaluate, not an assumption baked into the analysis. Baker knew, or should have known, this.

(f)    *Ignoring the medical-loss-ratio benchmark that governs the market for insurance-like risk products*. VMG failed to account for the ACA's medical loss ratio requirement, which generally requires health insurers to spend at least 80% of premium revenue on medical claims and quality improvement activities. 42 U.S.C. § 300gg-18(b)(1)(A)(ii). That legal requirement caps the market-wide ceiling for administration, marketing, claims processing, and

profit at roughly 20% of premium revenue for regulated insurers. Trinity's structure inverted that ratio—siphoning 60%–80% of member payments to fees, commissions, and profit—yet VMG's analysis ignored that fundamental market constraint. Defendants knew this omission made the opinion unreliable as a measure of "fair market value" for an insurance-like arrangement funded by premium-like contributions.

(g) *Economic implausibility given claims-paying realities*. Defendants knew or should have known that the fee levels under the Management Agreement and the 2020 Contracts were facially unreasonable and incompatible with the promise of meaningful coverage to members. Defendants knew that bona fide HCSMs typically devoted substantially higher percentages of member payments—often 70%–75%— than the percentage which was made available to Trinity for paying member medical expenses, and spent far less on administration.

107.    Defendants procured VMG Health's valuation opinion to create cover for Trinity's audit and Form 990 disclosures and to justify Trinity's entry into the 2020 Contracts without conducting competent due diligence. Defendants knew, or should have known, that VMG's valuation could not reasonably be relied upon for those purposes.

**I.    Defendants Charged Trinity Significant Fees Long After Other Third-Parties Concluded that Trinity was Neither a Legitimate HSCM nor Legitimately Tax Exempt.**

108.    By at least 2020, multiple third parties engaged by Trinity were refusing to participate in—much less validate—the fiction that Trinity was a legitimate HCSM or tax-exempt nonprofit providing lawful health care "sharing," as opposed to a vehicle being used by Aliera to perpetuate an unlawful scheme and enrich itself.

109.    CRI—the audit firm that Defendants pressed to issue an audit that concealed the related-party reality between Aliera and Trinity—recalled Trinity's 2018 audit in June 2020.

Windham Brannon, which Trinity retained to succeed CRI as its auditor, terminated its engagement in 2020 before completing Trinity's 2019 audit.

110.    In April 2020, Trinity retained a contractor, Claro Rodriguez, to serve as Controller. Within weeks, Rodriguez withdrew. He cited, among other things, Trinity's lack of "effective control of its Cash (ACH) receipts and disbursements," the fact that he had "not seen any changes or improvements," and Trinity's "major financial risk" from having "over 90% of its listed assets … sitting with Aliera" without Trinity knowing whether Aliera was liquid or solvent. Rodriguez further stated that he could not "in good conscience continue" to be a party to the arrangement or "pretend" that Trinity was serving members' interests rather than Aliera's. This was all shared with, and known by, Defendants.

111.    Like CRI, Windham Brandon, and Rodriguez, Defendants likewise knew, or should have known, that continuing to facilitate Trinity's operations breached the fiduciary duties they owed to Trinity's members. Nevertheless, from January 1, 2020, through March 31, 2021, Baker billed and Trinity paid more than $2 million in attorney fees. Throughout its representation of Trinity—and despite Trinity's insolvency, of which Baker was or should have been aware—Trinity paid Baker over $5 million in attorney fees.

112.    Trinity was insolvent throughout the Defendants' representation of it. Trinity's 2018 audit reflected liabilities exceeding assets and raised substantial doubt regarding Trinity's ability to continue as a going concern. Even that audit understated the seriousness of Trinity's condition. Trinity's only significant reported asset was a $5.2 million receivable "due from" Aliera—an entity that was itself insolvent or unable to repay what it owed Trinity. The audit also failed to capture the true scope of Trinity's escalating liabilities to members for unpaid medical

expenses. Trinity's financial condition deteriorated further throughout 2019 and 2020 as Aliera's unsecured debt to Trinity and Trinity's unpaid medical-expense obligations grew.

113.    In July 2021, Trinity's directors—by then operating under the name Sharity— finally did what Defendants should have advised at the outset: they voted to place Sharity into bankruptcy. The petition was filed on July 8, 2021, with the stated intent of separating Sharity from Aliera and continuing operations independently. Within weeks, however, the directors recognized that Sharity could not disentangle itself from Aliera, could not operate independently, and could not restructure in light of the magnitude of unpaid member claims. Sharity therefore voted to liquidate.

## V.    CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE (LEGAL MALPRACTICE)

114.    Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1-113, *above*.

115.    Trinity originally engaged Defendants as legal counsel with respect to federal income tax and insurance related regulatory matters, but their representation of Trinity grew to encompass such a wide variety of issues that it took on the role of *de facto* general counsel and business consultant.

116.    Trinity had an attorney-client relationship with Defendants, giving rise to duties of competence, diligence, loyalty, and candor, and were required to exercise the degree of care, skill, and diligence ordinarily exercised by attorneys practicing in similar circumstances.

117.    Defendants breached the applicable standard of care and their duties to Trinity, including without limitation by:

(a)  *Failing to advise cessation and remediation*. Failing to timely and unequivocally advise Trinity to cease selling, marketing, administering, or facilitating unauthorized insurance products (including through an "HCSM" label), and failing to advise Trinity to take prompt remedial steps to protect members and mitigate losses.

(b)  *Facilitating unlawful conduct*. Taking actions that enabled, facilitated, and prolonged Trinity's continued sale and administration of unauthorized insurance and its continued entanglement with Aliera, rather than counseling disengagement and lawful wind-down.

(c)  *Providing incompetent regulatory guidance*. Failing to provide competent advice regarding Trinity's regulatory obligations and exposure, including the legal consequences of continuing operations once Defendants knew or should have known that Trinity's model was unlawful, noncompliant, or unsustainable.

(d)  *Misleading or assisting misleading statements to regulators or other third parties*. Causing or assisting Trinity (or others acting for Trinity) to make incomplete, misleading, or false statements—or to omit material facts—in communications with regulators, courts, auditors, and other third parties, including statements or omissions that concealed the true nature of Trinity's relationship with Aliera and/or Trinity's operational realities. Plaintiff relies on Defendants' communications with courts and regulators as evidence of Defendants' knowledge, course of conduct, and breach of professional duties; Plaintiff's claims are not predicated solely on privileged advocacy but on Defendants' broader negligent and disloyal representation and enabling conduct.

(e)  *Negligent contracting and deal work*. Drafting, negotiating, and/or approving contracts and transactional arrangements that deepened Trinity's dependence on Aliera, transferred or allocated risk to Trinity without adequate safeguards, and/or failed to protect Trinity's interests—without conducting adequate due

diligence and without informing Trinity of the foreseeable legal and financial consequences.

(f) *Papering over structural defects*. Attempting to "paper over" fatal legal and operational deficiencies through restructuring, documentation, or formalities designed to create a veneer of legitimacy, instead of providing competent advice to terminate unlawful conduct and prevent additional harm.

(g) *Audit-related misconduct and improper pressure*. Interfering with, influencing, or providing improper guidance regarding Trinity's audits and financial reporting, including by promoting accounting positions, assumptions, or representations that Defendants knew or should have known were unsupported or misleading.

(h) *Improper tax reporting advice and omissions*. Providing negligent advice regarding Trinity's tax filings (including Form 990) and related-party disclosures, including advising or causing material omissions or misleading disclosures about Trinity's relationship with Aliera and/or the substance of Trinity's transactions.

(i) *Sham valuation / FMV opinion conduct*. Retaining, directing, or relying on valuation work and "fair market value" conclusions without adequate factual support, reasonable diligence, or adequate disclosure of assumptions and limitations, and using such valuations to justify or support transactions and reporting that harmed Trinity.

(j) *Failure to advise withdrawal and/or to withdraw*. Continuing representation and continuing to advise (or facilitate) conduct that Defendants knew or should have known was unlawful or harmful to Trinity, rather than advising withdrawal from such conduct and/or withdrawing from representation when required by professional standards.

(k) *Fees in the face of known illegality and harm*. Continuing to charge and collect significant fees for work that prolonged or enabled unlawful

operations and increased Trinity's exposure, rather than advising a lawful wind-down and mitigation of harm.

118.    As a direct and proximate result of Defendants' negligence, Trinity suffered damages including but not limited to: increased liabilities, depletion of assets, exposure to regulatory enforcement, accumulation of unpaid member claims, professional fees and expenses charged by and paid to Defendants, and ultimate insolvency, resulting in harm to the bankruptcy estate, now represented by Plaintiff.

119.    Defendants' conduct constitutes not merely negligence but willful misconduct, wantonness, and an entire want of care sufficient to support an award of punitive damages under O.C.G.A. 51-12-5.1.

## COUNT II
## BREACH OF FIDUCIARY DUTY

120.    Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1-119, *above*.

121.    Defendants entered into an attorney-client relationship with Trinity and, in doing so, undertook fiduciary duties to Trinity.

122.    As Trinity's counsel, Defendants owed Trinity duties including, without limitation: (a) undivided loyalty; (b) full disclosure of material facts; (c) candor and honesty; (d) avoidance of conflicts of interest; (e) not placing their own interests (including fee generation) above Trinity's interests; and (f) acting in good faith and in Trinity's best interests.

123.    Defendants' role extended beyond isolated tasks: Defendants held themselves out—and acted—as key advisors to Trinity on regulatory strategy, corporate structuring, contracting, and interactions with auditors and other third parties, giving Defendants substantial influence over Trinity's decisions and course of conduct.

124.    Defendants breached their fiduciary duties to Trinity, including by engaging in conduct that favored Defendants' own interests and/or the interests of Aliera over Trinity's interests, and by withholding material information and providing guidance designed to prolong and "paper over" unlawful conduct rather than protect Trinity.

125.    Defendants' fiduciary breaches include, without limitation:

(a)    *Disloyalty/conflicted conduct*. Acting with divided loyalties and subordinating Trinity's interests to the interests of Aliera and/or Defendants' own financial interests, including by advising and implementing strategies that preserved the Aliera-Trinity arrangement despite known legal and operational deficiencies.

(b)    *Self-interested fee conduct*. Placing Defendants' own interest in continuing and expanding legal fees ahead of Trinity's interests by promoting a course of action that prolonged Trinity's operations and exposure, rather than counseling a prompt cessation of unlawful conduct, disengagement, and mitigation of harm.

(c)    *Failure of full disclosure*. Failing to disclose to Trinity's decision-makers (and, where appropriate, to independent fiduciaries) material facts and risks known to Defendants, including the legal consequences of continuing to operate as structured, the severity of regulatory exposure, and the predictable escalation of claims and liabilities.

(d)    *Concealment and lack of candor*. Causing, assisting, or encouraging Trinity to make incomplete or misleading statements—or omit material information—in communications with regulators, auditors, or other third parties, including omissions that concealed the true substance of Trinity's relationship with Aliera and/or the operational realities of Trinity's business.

(e)    *Using third parties to create a veneer of legitimacy*. Steering, pressuring, or influencing auditors, tax preparers, and valuation professionals to adopt

– 46 –

positions or assumptions that would support a preferred narrative, rather than ensuring accurate disclosure and protecting Trinity from foreseeable harm.

(f)     *Deal-making that harmed the client*. Drafting, negotiating, or blessing contractual arrangements and restructurings that increased Trinity's dependence on Aliera, transferred risk to Trinity, or otherwise worsened Trinity's position—without advising Trinity to obtain independent counsel and without providing full and fair disclosure of the conflicts and consequences.

(g)     *Failure to advise withdrawal / remedial action*. Continuing representation and assisting continued operations despite knowing (or having reason to know) the operations were unlawful or harmful to Trinity, rather than insisting on lawful remediation, advising termination of unlawful conduct, and/or withdrawing where required by professional obligations.

126.    As a direct and proximate result of Defendants' breaches of fiduciary duty, Trinity suffered substantial harm, including: continuing operations and transactions it otherwise would have ceased or restructured promptly; increased exposure to member claims and regulatory enforcement; and additional professional fees and costs that would not have been incurred absent Defendants' disloyal and conflicted conduct.

127.    As a further consequence of their fiduciary breaches, Defendants are not entitled to retain fees obtained through disloyal, conflicted, or bad-faith conduct, warranting disgorgement/forfeiture to the extent permitted by law.

128.    Defendants' fiduciary breaches reflected willful misconduct, wantonness, and an entire want of care. This conduct is sufficient to support an award of punitive damages under O.C.G.A. § 51-12-5.1.

129.    Plaintiffs seek all damages proximately caused by Defendants' fiduciary breaches, including compensatory and punitive damages in amounts to be proven at trial.

## COUNT III
## CONTRIBUTION

130.    Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1-129, *above*.

131.    Under plans approved by the bankruptcy court, Sharity's members are allowed a claim against the Sharity Estate, for, at a minimum, the amount of their monthly "contributions" and enrollment fees. That amount totals $362,764,161 and is a fixed liability.

132.    The claims arise out of Defendants' malpractice and breaches of fiduciary duty.

133.    Plaintiff asserts a right of contribution from Defendants under O.C.G.A. §§ 23-2-71 and 51-12-32.

## COUNT IV
## ATTORNEY FEES AND COSTS

134.    Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1-133, *above*.

135.    Defendants have acted in bad faith, been stubbornly litigious, and caused Plaintiff unnecessary trouble and expense by knowingly enabling unlawful conduct, concealing material risks, and forcing the Trustee to incur substantial fees to investigate, unwind, and litigate Defendants' misconduct. As such, Plaintiff is entitled to an award of damages, including reasonable attorney fees and expenses incurred in bringing this action, pursuant to O.C.G.A. § 13-6-11.

## COUNT V
## PUNITIVE DAMAGES

136.    Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1-135, *above*.

137. Defendants' actions, as set forth above, show willful misconduct, wantonness and that entire want of care which raises the presumption of a conscious indifference to the consequences of their acts. Accordingly, Plaintiff is entitled to an award of punitive damages pursuant to O.C.G.A. § 51-12-5.1.

### DEFINITIONS FOR COUNTS VI-IX RELATED TO TRANSFERS

138. Defined Transfer Terms and Lookback Periods for purposes of transfer claims are as follows:

(a) *Transfers*. "Transfers" means payments of money and/or the incurrence of obligations by Trinity/Sharity to or for the benefit of Baker in respect of attorneys' fees, expenses, and other amounts billed in connection with Defendants' representation, including payments made on invoices and other charges for legal services.

(b) *UVTA Transfers*. "UVTA Transfers" means Transfers made within four (4) years prior to the Petition Date of July 8, 2021, including Transfers beginning in late 2018. *See* O.C.G.A. §§ 18-2-70 through 18-2-82.

(c) *548 Transfers*. "548 Transfers" means Transfers made within two (2) years prior to the Petition Date—i.e., on or after July 8, 2019 and before July 8, 2021. *See* 11 U.S.C. § 548.

(d) *Member Claims/Triggering Creditor*. Beginning no later than November 18, 2018, Trinity's members held claims against Trinity/Sharity arising from promises to share and pay members' medical expenses and related obligations ("Member Claims"). The Member Claims constitute "claims" within the meaning of 11 U.S.C. § 101(5) and "claims" under O.C.G.A. § 18-2-71(3), whether contingent, unliquidated, unmatured, disputed, or undisputed. On information and belief, at the time of each UVTA Transfer, one or more members holding Member Claims were creditors of Trinity/Sharity with allowable unsecured claims within the meaning of 11 U.S.C. § 502 and could

have avoided such transfers under O.C.G.A. §§ 18-2-74 and/or 18-2-75. Accordingly, the Trustee may bring the UVTA avoidance claims pursuant to 11 U.S.C. § 544(b)(1).

**COUNT VI**
**VOIDABLE TRANSFERS AND OBLIGATIONS –**
**CONSTRUCTIVE FRAUD AS TO PRESENT CREDITORS**
**(11 U.S.C. § 544(b) and O.C.G.A. § 18-2-75(a))**

139.    Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1-138, *above*.

140.    Baker was the initial transferee of the UVTA Transfers and received such transfers directly from Trinity in exchange for legal services that, as described in detail herein, did not constitute reasonably equivalent value under the circumstances.

141.    Pursuant to 11 U.S.C. § 544(b)(1), the Sharity Trustee seeks to avoid UVTA Transfers that are voidable under O.C.G.A. § 18-2-75(a).

142.    Sharity made the UVTA Transfers to Baker during the four (4) years prior to the Petition Date (July 8, 2021), including Transfers beginning in late 2018, in an aggregate amount exceeding $5.5 million.

143.    At the time of each UVTA Transfer, Sharity had one or more "present creditors," including members holding Member Claims beginning no later than November 18, 2018.

144.    Sharity was insolvent at the time the UVTA Transfers were made, within the meaning of O.C.G.A. § 18-2-72.

145.    And the UVTA transfers paid for legal services that: (a) did not provide reasonably equivalent value; (b) were rendered while Defendants knew or should have known Sharity should cease unlawful operations and mitigate harm; and (c) prolonged and exacerbated Sharity's

liabilities and exposure. *See, e.g., Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp. I),* 333 B.R. 506, 532 (Bankr. D.D.C. 2005).

146.    The UVTA Transfers are avoidable under O.C.G.A. § 18-2-75(a), and the Trustee is entitled to the remedies set forth in O.C.G.A. § 18-2-77(a), as incorporated through 11 U.S.C. § 544(b)(1).

## COUNT VII
## VOIDABLE TRANSFERS AND OBLIGATIONS –
## CONSTRUCTIVE FRAUD AS TO PRESENT OR FUTURE CREDITORS
## (11 U.S.C. § 544(b) and O.C.G.A. §§ 18-2-74(a)(2))

147.    Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1-146, *above.*

148.    Pursuant to 11 U.S.C. § 544(b)(1), the Sharity Trustee seeks to avoid UVTA Transfers that are voidable under O.C.G.A. § 18-2-74(a)(2).

149.    Sharity made the UVTA Transfers to Baker during the four (4) years prior to the Petition Date, including Transfers beginning in late 2018, in an aggregate amount exceeding $5.5 million. *See Exh. 2.*

150.    Sharity did not receive reasonably equivalent value in exchange for the UVTA Transfers for the reasons alleged above.

151.    At the time of the UVTA Transfers and/or the incurrence of the obligations satisfied by the UVTA Transfers, Sharity was engaged in (or was about to engage in) business or a transaction for which Sharity's remaining assets were unreasonably small in relation to the business or transaction, including operating a membership program that generated Member Claims beginning no later than November 18, 2018.

152.    Alternatively, at the time of the UVTA Transfers and/or the incurrence of the obligations satisfied by the UVTA Transfers, Sharity intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

153.    The UVTA Transfers are avoidable under O.C.G.A. § 18-2-74(a)(2), and the Trustee is entitled to the remedies set forth in O.C.G.A. § 18-2-77(a), as incorporated through 11 U.S.C. § 544(b)(1).

## COUNT VIII
## FRAUDULENT TRANSFERS AND OBLIGATIONS – CONSTRUCTIVE FRAUD (11 U.S.C. § 548(a)(1)(B))

154.    Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1-153, *above*.

155.    This Count is brought by the Trustee pursuant to 11 U.S.C. § 548(a)(1)(B) to avoid transfers of an interest of Trinity/Sharity in property and/or obligations incurred by the it.

156.    The bankruptcy Petition Date is July 8, 2021.

157.    Within two (2) years before the Petition Date—i.e., on or after July 8, 2019 and before July 8, 2021 (the "§ 548 Lookback Period")—Trinity/Sharity made transfers to Baker & Hostetler LLP ("Baker") in the form of payments on invoices and/or other amounts charged for legal services (the "548 Transfers"), in an aggregate amount exceeding $5 million. *See Exh. 2.*

158.    The 548 Transfers constituted transfers of an interest of Trinity/Sharity in property within the meaning of 11 U.S.C. § 548(a).

159.    Trinity/Sharity received less than reasonably equivalent value in exchange for the 548 Transfers. Among other things, the 548 Transfers were made for legal services that did not confer reasonably equivalent value and/or were rendered while Defendants knew or should have known Trinity/Sharity's operations could not be conducted legitimately and should have been counseled to cease operations and mitigate harm, and the services for which Trinity/Sharity paid

prolonged and exacerbated Trinity/Sharity's liabilities and exposure. *See, e.g., Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp. I*, 333 B.R. 506, 532 (Bankr. D.D.C. 2005).

160.    At the time Trinity/Sharity made the 548 Transfers and/or incurred the obligations satisfied by those transfers, Trinity/Sharity: (a) was insolvent or became insolvent as a result of the transfers and/or obligations; and/or (b) was engaged in business or transactions for which its remaining property constituted unreasonably small capital; and/or (c) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as such debts matured. Specifically, from the commencement of Defendants' representation of Trinity/Sharity, its financial condition was such that the sum of its debts was greater than all of its property, at fair valuation, exclusive of property defined under 11 U.S.C. § 101(32).

161.    Accordingly, the 548 Transfers are avoidable under 11 U.S.C. § 548(a)(1)(B).

162.    Plaintiff is entitled to all relief available under the Bankruptcy Code, including avoidance of the 548 Transfers and recovery under 11 U.S.C. § 550, together with pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

### COUNT IX
### RECOVERY OF AVOIDED TRANSFERS
### (11 U.S.C. § 550)

163.    Plaintiff restates and incorporates herein by reference the allegations contained in paragraphs 1-162, *above*.

164.    To the extent any Transfers are avoided under 11 U.S.C. § 544(b)(1) and/or 11 U.S.C. § 548(a)(1)(B), the Trustee may recover, for the benefit of the estate, the property transferred or the value of such property from the initial transferee. 11 U.S.C. § 550(a)(1).

165.    Baker was the initial transferee of the Transfers, including the UVTA Transfers and the 548 Transfers.

166.    The Trustee is entitled to recover from Baker the property transferred or, if the Court so orders, the value of such property, plus pre- and post-judgment interest and such other relief as is just and proper.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants, and award the following relief:

(a)    *Avoidance of Transfers*. An order avoiding the Transfers, in whole or in part, pursuant to 11 U.S.C. § 544(b)(1) and/or § 548(a) and O.C.G.A. §§ 18-2-74 and/or 18-2-75, and/or any other applicable provision of law;

(b)    *Recovery Under § 550*. An order authorizing recovery, for the benefit of the estate, of the property transferred and/or the value of such property from Defendants pursuant to 11 U.S.C. § 550(a), together with pre- and post-judgment interest;

(c)    *Money Judgment on Tort Claims*. A money judgment for all compensatory damages proximately caused by Defendants' misconduct, including damages resulting from Defendants' legal malpractice and breaches of fiduciary duty, in an amount to be proven at trial;

(d)    *Punitive damages*. An award of punitive damages as allowed by law.

(e)    *Disgorgement/Fee Forfeiture*. To the extent available, an order requiring Defendants to disgorge and/or forfeit fees and other amounts received in breach of fiduciary duty, and awarding such other equitable relief as the Court deems just and proper;

(f)    *Attorneys' Fees and Expenses*. An award of Plaintiff's attorneys' fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11 (and any other applicable authority), based on Defendants' bad faith, stubborn litigiousness, and/or causing Plaintiff unnecessary trouble and expense;

(g)    *Interest*. Pre-judgment and post-judgment interest as allowed by law;

(h)     *Costs*. Costs of suit and such other costs as are recoverable by law; and

(i)     *Other Relief*. Such other and further legal and equitable relief as the Court deems just and proper.

Plaintiff demands a trial by jury on all issues so triable.

DATED:    February 26, 2026          Respectfully submitted,
           Atlanta, Georgia

*/s/ Angela Forstie*
Linley Jones
State Bar No. 403045
Angela Forstie
State Bar No. 940654
**THE LINLEY JONES FIRM, P.C.**
3334 Peachtree Road NE, Suite CU-2
Atlanta, GA 30326
(404) 418-0000 office
(404) 418-0049 fax
linley@linleyjones.com
angela@linleyjones.com

Richard E. Spoonemore*
Eleanor Hamburger*
**SIRIANNI YOUTZ SPOONEMORE
HAMBURGER PLLC**
3101 Western Avenue, Suite 350
Seattle, WA 98121
(206) 223-0303 office
(206) 223-0246 fax
rspoonemore@sylaw.com
ehamburger@sylaw.com

Joshua Karsh*
**MEHRI & SKALET, PLLC**
2000 K Street NW, Suite 235
Washington, DC 20006
(202) 822-5100 office
(202) 822-4997 fax
JKarsh@findjustice.com

* *Pro Hac Vice* Applications Forthcoming

***Counsel for Plaintiff***